WRG ENTERPRISES, INC.,
Plaintiff/Appellant,

v.

Gentry CROWELL, Secretary of State
and W.J. Michael Cody, Attorney General of the State of Tennessee, Defendants/Appellees.

Supreme Court of Tennessee,
at Nashville.

Sept. 26, 1988.

Harris A. Gilbert, Gilbert & Milom,
Nashville, Errol Copilevitz, John P. Jennings, Jr., Copilevitz, Bryant, Gray & Jennings, P.C., Kansas City, Mo., for plaintiff/appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Perry Allan Craft, Deputy Atty. Gen.,
Steven A. Hart, Mark Tyler Seitz, Asst.
Attys. Gen., Nashville, for defendants/appellees.

## OPINION

O'BRIEN, Justice.

Plaintiff filed an application for a certificate of registration as a professional solicitor with the charitable solicitations division of the Secretary of State's Office. The application was denied. After appropriate hearings pursuant to the Administrative Procedures Act a complaint and petition for review were filed in the Chancery Court for Davidson County challenging the constitutionality of T.C.A. §§ 48–3–513(i) and 48–3–513(k).

The foregoing statutes incorporate two (2) of the provisions of Tennessee's Solicitation of Charitable Funds Act, T.C.A. § 48–3–501, et seq. By agreement of the parties the case was submitted for decision in the trial court on the following written stipulation of facts:

1. WRG Enterprises, Inc. is a for profit corporation, with offices located at 1507 Laurel Street, Sarasota, Florida. Mr. Paul Monville is the president of WRG Enterprises, Inc.

2. WRG Enterprises, Inc. is a professional fund-raising council of charitable funds and a "professional solicitor" as defined in T.C.A. § 48–3–501(5).

3. WRG Enterprises, Inc. was licensed as a professional fund-raising council [sic] of charitable funds in the state of Tennessee for the period between September 12, 1985, and December 31, 1985, pursuant to a certificate of registration issued by the Secretary of State.

4. After WRG Enterprises, Inc. was granted a certificate of registration to solicit charitable funds in Tennessee, the Charitable Solicitations Division of the Office of the Secretary of State became aware of two agreements to solicit charitable funds which called for a commission of thirty-five percent (35%) of "collateral [sic] monies" to be paid to WRG Enterprises, Inc. The first of these agreements was entered into on April 15, 1985, between WRG Enterprises, Inc. and the Dyersburg, Tennessee Jaycees. The second of these agreements was entered into on August 14, 1985, between WRG Enterprises, Inc. and the Optimist Club of White Station, Memphis, Tennessee, Inc. T.C.A. § 48–3–513(k) states that "a professional solicitor's total fee shall not be in excess of fifteen percent (15%) of the gross contributions which he solicits; all fund raising costs shall be included in such gross contributions."

5. WRG Enterprises, Inc. stated on its 1985 application for registration as a professional fund raising council of charitable funds that they intended to implement a solicitation program which included telemarketing. Likewise, WRG Enterprises, Inc's 1986 application for renewal of its certificate of registration states that WRG Enterprises, Inc. intends to implement a solicitation program which includes telemarketing.

6. T.C.A. § 48–3–513(i) states that "telephone solicitation shall not be made by any professional solicitor or his agent, servant, or employee in any manner whatsoever."

7. Based upon the foregoing, the Charitable Solicitations Division of the Office of the Secretary of State denied the renewal of the certificate of registration issued to WRG Enterprises, Inc. on February 28, 1986.

8. WRG Enterprises, Inc. filed a timely request for a hearing before the Secretary of State.

9. WRG Enterprises, Inc., if registered to solicit charitable funds in Tennessee, intends to enter into contracts and may charge a commission in excess of fifteen percent (15%) of gross contributions for services rendered in connection therewith as a professional fund raising council of charitable funds. Additionally, if licensed, WRG Enterprises, Inc. intends to conduct a program of solicitation which includes telemarketing.

10. It is the intent of the parties that all constitutional issues are not to be presented to this forum; however, the parties agree that any constitutional issues may be raised upon appeal to Chancery Court and thereafter.

The chancellor upheld the constitutionality of the code sections in question. An appeal has been taken to this Court pursuant to T.C.A. § 16–4–108 with the sole issue being the constitutional validity of T.C.A. § 48–3–513(i) and § 48–3–513(k).

▌ The challenge mounted here is directed to purported violations of both the First and Fourteenth Amendments to the United States Constitution and Article I, Sec. 19 of the Tennessee Constitution. This Court has previously recognized that regulation of First Amendment rights is subject to exacting judicial review, as well as the duty imposed upon the State to demonstrate that any burden placed on Free Speech Rights must be justified by a compelling State interest. See *Bemis Pentecostal Church v. State,* 731 S.W.2d 897, 903 (Tenn.1987). However, we reject appellant's assertion that the burden of proving the legitimacy of a statute challenged on First Amendment grounds rests on the statute's proponent. The authorities cited for this proposition are based on the imposition of injunctive restraint against free speech and the argument rests on the statement that "any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." See *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). The burden of proof may be ameliorated to some extent by the strict scrutiny test imposed in First Amendment cases however that burden as well as the burden of persuasion remains with the

challenger. This rule prevails even though "A law that impinges upon a fundamental right explicitly or implicitly secured by the Constitution is presumptively unconstitutional." *City of Mobile, Alabama v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Nonetheless, statutes should be construed whenever possible so as to uphold their constitutionality. *United States v. Vuitch,* 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971). Also see *Fritts v. Wallace,* 723 S.W.2d 948, 949 (Tenn.1987).

We look first to the constitutionality of T.C.A. § 48–3–513. This code section spells out certain restraints imposed by the Solicitation of Charitable Funds Act and contains a series of regulatory provisions. Subsection (i) specifically mandates that "Telephone solicitations shall not be made by any professional solicitor or his agent, servant, or employee in any manner whatsoever."

The United States Supreme Court decisions involving First Amendment limitations on prohibitions against the solicitation of contributions by charitable organizations have been synthesized in three recent cases. *Village of Schaumburg v. Citizens for a Better Environment, et al,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Secretary of State of Maryland v. Joseph H. Munson Company, Inc.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Riley v. National Federation of the Blind of North Carolina,* — U.S. —, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). There is not any specific reference to telephone solicitations by professional solicitors of contributions on behalf of charitable organizations in any of these three cases. Appellant informs us that there have been only two published cases which have directly considered that prohibition. The North Carolina Legislature enacted a statute making it a misdemeanor to solicit contributions for charities by telephone. In *Optimist Club of North Raleigh v. Riley,* 563 F.Supp. 847 (E.D.N.C.1982) the federal district court, citing *Village of Schaumburg v. Citizens,* supra, struck down the statute, rejecting defendant's assertion that it was narrowly tailored to prevent fraud by regulating the type and manner of charitable solicitations. The court held:

"[P]laintiffs have shown that the total ban of telephone solicitation infringes on the First Amendment rights of professional solicitors and has a substantially restrictive effect not only on the solicitor's right to communicate, but also on the ability of charitable organizations to conduct different ﺍtypes of solicitation campaigns."

In *Planned Parenthood League v. Attorney General,* 391 Mass. 709, 464 N.E.2d 55 (1984), cert. denied 469 U.S. 858, 105 S.Ct. 189, 83 L.Ed.2d 122 (1984), the Massachusetts Court reasoned as follows:

"To effectuate legitimate governmental goals, a restriction may regulate in any reasonable way the time, place or manner of speech, provided that the regulation is applied to all speech, regardless of content. *Consolidated Edison Company of New York v. Public Service Commission of New York,* supra, 447 U.S. [530] at 536, 100 S.Ct. at [2326] 2332 [65 L.Ed.2d 319 (1980)]. 'The First Amendment's hostility to content based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.' *Id.* at 537, 100 S.Ct. at 2333. ... [The] prohibition applies only to bar paid solicitations by charities, the statute cannot be considered a time, place or manner restriction."

In the three cases mentioned heretofore, *Schaumburg* involved an ordinance prohibiting door-to-door or on street solicitation of contributions by charitable organizations. *Munson* was a suit brought by a professional fund raiser for declaratory and injunctive relief challenging a twenty-five percent (25%) limit on charitable fund raising expenses imposed by a Maryland statute. *Riley* was initiated by a coalition of professional fund raisers, charitable organizations and potential charitable donors seeking injunctive and declaratory relief from a provision of the North Carolina Charitable Solicitations Act prohibiting professional fund raisers from retaining an unreasonable or excessive fee. In each

case the restrictive legislation was struck down by the courts. As we have noted none of the three dealt directly with telephone solicitation. However, in a discussion of compelled disclosure by professional fund raisers, the *Riley* court implicitly included solicitation by telephone within First Amendment proscription against legislative limitation on charitable contribution solicitation. The court said, "..., in the context of a verbal solicitation, if the potential donor is unhappy with the disclosed percentage, the fund raiser will not likely be given a chance to explain the figure; the disclosure will be the last words spoken as the donor closes the door *or hangs up the phone.*" 108 S.Ct. at 2679. (Emphasis supplied).

The State recognizes that both *Schaumburg* and *Munson,* supra, stand for the proposition that some charitable solicitations are so intertwined with speech that they are entitled to the strictest protections of the First Amendment. Fundamentally they rely on the dissenting opinion in *Munson* and the opinion of the chancellor in the court below to defend the code sections questioned here. They argue that although the chancery court agreed that the Telephone Solicitation Statute restricted protected speech, it upheld the statute as a valid time, place or manner regulation serving a significant governmental interest, leaving open ample opportunities for alternative channels of communications. The chancery decree stated in pertinent part:

"The statutory provision serves two significant governmental interests. First, it protects the State's citizens from telephone solicitations providing the opportunity for misrepresentations or deceptions by paid professional solicitors who are motivated by profit. Second, the government has a substantial interest in protecting the residential privacy of its citizens and to protect them from undue annoyance and unwelcome telephone solicitations. The provision is narrowly drawn to serve the State's interest and leaves open other avenues of communication by the professional solicitor and closes no avenues of communication for the charity itself. Therefore, T.C.A.

§ 48–3–513(i) is a valid manner restriction on First Amendment speech ..."

■ In regard to the chancellor's finding that the statutory prohibition on telephone solicitation by professional solicitors is a valid time, place or manner regulation serving significant governmental interests, we are persuaded by the reasoning of the Massachusetts court in *Planned Parenthood,* supra. Furthermore, there has been no showing that this appellant has engaged in fraudulent practices in this or any other State. Nor has there been any showing that the statute as written provides any direct deterrence to fraud in any respect. "Mere speculation does not constitute a compelling state interest." *Consolidated Edison Company v. Public Service Commission of New York,* supra. Prohibition of telephone solicitations is not the least restrictive means available to the State in seeking to protect its citizens from fraud. "Where, as here, a statute imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack." *Munson,* supra, 104 S.Ct. p. 2852. Commission of a fraudulent act is punishable as a felony and as a misdemeanor under T.C.A. § 48–3–515. The Charitable Solicitations Act requires that all charitable organizations provide information relative to their fund raising activities directly to the Secretary of State. T.C.A. § 48–3–504. It is clear that insofar as it prohibits telephone solicitations by professional solicitors T.C.A. § 48–3–513(i) is unconstitutional and in violation of the First and Fourteenth Amendments to the United States Constitution and Article I, §§ 8 and 19 of the Tennessee Constitution.

■ In regard to the constitutional validity of T.C.A. § 48–3–513(k), this section provides:

"A professional solicitor's total fee shall not be in excess of fifteen percent (15%) of the gross contributions which he soli-

cits; all fund raising costs shall be included in such gross contributions."

It is appellant's position that the solicitation of funds is a form of free speech subject to overbreadth analysis. It is argued that this particular code section is overbroad and violates constitutional provisions securing that right. The State on the other hand says that appellant's view that the statutory limitation on the fee of a professional solicitor impinges upon the free speech rights of charitable organizations is a fundamental misconception. They take the position that the percentage limitation operates only as a limitation upon the compensation of a professional solicitor in business for profit which satisfies a rational basis analysis. The State calls to our attention a number of cases which pre-date *Schaumburg, Munson* and *Riley*. We conclude that their earnest protestation in support of the statute is to no avail. In *Munson,* the court established the right of the professional fund raiser to bring the action although there was no claim that its own First Amendment right had been infringed by the challenged statute. It held that the Maryland act which prohibited a charitable organization from paying expenses of more than twenty-five percent (25%) of the amount raised in connection with any fund-raising activity was substantially overbroad and subject to facial attack.

In this case the State also relies on the findings of the chancellor to sustain their position in reference to this challenge. The chancellor endeavored to distinguish the statutes at issue in *Schaumburg* and *Munson* from the Tennessee statute in these words:

"In the present case, T.C.A. § 48–3–513(k) only limits the amount that the professional solicitor can receive as a fee, while the statute at issue in *Schaumburg* and *Munson* unconstitutionally limited the amount of money that a charity could pay for fund-raising activities. Thus, the Tennessee statute does not impair the charities First Amendment rights; it merely regulates the amount of profit that the professional solicitor can collect. Therefore, the court concludes that T.C.A. § 48–3–513(k) is simply a valid economic regulation by the State that supports a significant State interest in protecting its citizens from the opportunity of fraud and misrepresentation by profit motivated solicitors."

We do not interpret the decisions of the United States Supreme Court in that light. In response to similar assertions the *Riley* court had this to say:

"... The State offers two distinctions. First, it asserts a motivating interest not expressed in *Schaumburg* or *Munson:* ensuring that the maximum amount of funds reach the charity or, somewhat relatedly, to guarantee that the fee charged charities is not 'unreasonable.' Second, the State contends that the act's flexibility more narrowly tailors it to the State's asserted interest than the laws considered in our prior cases. We find both arguments unavailing.

The State's additional interest in regulating the fairness of the fee may rest on either of two premises (or both): (1) That charitable organizations are economically unable to negotiate fair or reasonable contracts without governmental assistance; or (2) that charities are incapable of deciding for themselves the most effective way to exercise their First Amendment rights. Accordingly, the State claims the power to establish a single transcendent criterion by which it can bind the charities' speaking decisions. We reject both premises.

The first premise, notwithstanding the State's almost talismanic reliance on the mere assertion of it, amounts to little more than a variation of the argument rejected in *Schaumburg* and *Munson* that this provision is simply an economic regulation with no First Amendment implication, and therefore must be tested only for rationality. We again reject that argument; this regulation burdens speech, and must be considered accordingly. There is no reason to believe that charities have been thwarted in their attempt to speak or that they consider the contracts in which they enter to be any-

thing less than equitable. Even if such a showing could be made, the State's solution stands in sharp conflict with the First Amendment's command that government regulation of speech must be measured in minimums, not maximums. The State's remaining justification—the paternalistic premise that charities' speech must be regulated for their own benefit—is equally unsound. The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it.... 'The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public minds through regulating the press, speech, and religion.' ... To this end, the government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government. We perceive no reason to engraft an exception to this settled rule for charities." (Citations omitted).

The *Riley* case stands for the proposition that a percentage based regulation upon the fees to be collected by professional solicitors is an unconstitutional invasion upon the First Amendment rights of charities and fund raisers alike. The Tennessee statute falls within the ambit of that proscription. T.C.A. § 48–3–513(k) violates the First and Fourteenth Amendments to the United States Constitution and sections 8 and 19 of Article I of the Constitution of Tennessee.

The judgment of the chancery court is reversed. The case is remanded for any further proceedings necessary consistent with this opinion and for the collection of costs which are assessed equally between the parties.

HARBISON, C.J., and FONES, COOPER and DROWOTA, JJ., concur.